In the

# United States Court of Appeals

### For the Seventh Circuit





No. 06-1427

IN RE

FACTOR VIII OR IX CONCENTRATE
BLOOD PRODUCTS LITIGATION

DOMENICO GULLONE, et al.,

    *Plaintiffs-Appellants,*

v.

BAYER CORPORATION, *et al.*,

    *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
MDL No. 986; No. 1:03-CV-8928—**John F. Grady,** *Judge.*

ARGUED SEPTEMBER 13, 2006—DECIDED MAY 4, 2007

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* In the early 1980s, the HIV/AIDS epidemic burst onto the scene. Its seriousness could not be overstated: AIDS ravaged the immune systems of its victims and seemed to be inevitably fatal. Although initially the disease seemed to target gay men, it soon became apparent that it could strike anyone who was exposed to it. According to a history of AIDS prepared by the National Institutes of Health, "By the summer of

1982, scientists had convincing evidence that AIDS must be caused by a blood-borne and sexually transmitted virus." See "In Their Own Words: NIH Researchers Recall the Early Years of AIDS," http://aidshistory.nih.gov/tip_of_the_iceberg/index.html (visited April 5, 2007). One group that proved to be especially vulnerable was hemophiliacs, who need frequent transfusions of blood factors that cause clotting. Before 1985, when it became possible to test donated blood to ensure that it was free of the AIDS virus, close to half of all hemophiliacs became infected with the virus. See Gina Kolata, *Hemophilia and AIDS: Silent Suffering*, N.Y. TIMES, May 16, 1988.

The appeals now before us are the fourth in a series that has arisen from litigation brought by hemophilic individuals who were infected with HIV or Hepatitis C virus (HCV) by contaminated blood products known as Factor VIII and Factor IX ("Factor Concentrates"). See also *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 159 F.3d 1016 (7th Cir. 1998) (enforcing a settlement); *In the Matter of Rhone-Poulenc Rorer Pharms., Inc.*, 138 F.3d 695 (7th Cir. 1998) (denying a petition for a writ of mandamus relating to the designation of expert witnesses for trial); *In the Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995) (reversing a partial class certification). Turning to many federal courts around the United States, the plaintiffs sued a number of major drug companies ("the Drug Companies"). These suits, which were consolidated by the Judicial Panel on Multidistrict Litigation in the Northern District of Illinois under the docket number MDL-986, claimed that the defendant companies had intentionally recruited urban homosexuals, prisoners, and intravenous drug users to serve as blood donors, even though they knew that these donors were at high risk of carrying blood-borne diseases including the viruses that cause AIDS and Hepatitis C. The Drug Companies allegedly also failed to disclose the known risks of their prod-

No. 06-1427 3

ucts; failed to use available screening tests; failed to use available treatments for killing the viruses in the plasma; and continued to export non-heat-treated Factor Concentrates overseas after adopting safer methods for products sold in the United States.

The cases brought by many of the plaintiffs are still pending before the district court. *Gullone v. Bayer Corp.*, however, was brought by a group from the United Kingdom, Italy, Germany, Israel, Argentina, and the State of Nebraska. Finding that the United Kingdom would be a more appropriate forum in which to handle the claims of the U.K. plaintiffs, the district court granted a motion by the Drug Companies to dismiss those claims on the ground of *forum non conveniens*; it certified that ruling as final and ready for appeal under FED. R. CIV. P. 54(b). Although we find it a close call, largely because the district court placed surprisingly little weight on the interest of California (the original forum) in this litigation and it may have over-estimated the administrative difficulties in keeping the case in the United States, we conclude in the end that the court acted within its discretion when it dismissed the case. We therefore affirm.

I

As we noted earlier, litigation about Factor Concentrate has been going on for some time; this case, along with its companions in the MDL, belongs to the "second generation" group. The district court described the earlier, "first generation" cases, in its opinion in order to provide the background for its ruling in the *Gullone* litigation. We include the highlights of that discussion here.

The preferred treatment for hemophilia, a hereditary disease in which the protein that causes blood clotting is missing, is intravenous injection of the necessary

protein. The protein used in these treatments is derived from the plasma of donated blood. Using a process called "fractionating," the manufacturer can derive Factor Concentrates from the plasma; the Factor Concentrates are then sold for use by hemophiliacs. The principal four defendants throughout these proceedings have been Baxter Healthcare Corporation, Bayer Corporation, Alpha Therapeutic Corporation, and Armour Pharmaceutical Company; together, they produce practically all of the Factor Concentrates used in the United States. If the donated blood from which the Factor Concentrate is derived is contaminated with HIV or HCV, then the resulting concentrate may also be contaminated, unless it is subjected to a heat treatment or other method of viral inactivation. It is undisputed that some contaminated Factor Concentrates were sold, and that this was the way in which many hemophiliacs contracted AIDS or Hepatitis C.

The first generation lawsuits were brought against the Drug Companies by hemophiliacs who had contracted AIDS, their family members, and their personal representatives. The basic legal theory underlying these suits was negligence. See *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d at 1300. Most of those claims were resolved in 1997 through a settlement. See *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 159 F.3d at 1020 (approving the settlement). The "second generation" claims arose from allegations of knowing misconduct directed specifically toward victims outside the United States. The *Gullone* case was filed in the Northern District of California on June 3, 2003; many other suits on behalf of other foreign victims, from many other countries, followed in the courts of California, Florida, Illinois, and Texas. All of these cases were collected in the same multi-district litigation proceeding, MDL-986, that existed for the first-generation cases.

At this point, the only *forum non conveniens* ruling before us is the district court's decision to sever the claims

No. 06-1427                                                    5

of the U.K. plaintiffs and to dismiss those claims so that they may be pursued in the courts of the United Kingdom. The fact that the United Kingdom may—or may not—be an adequate alternative forum obviously says nothing about the adequacy of any other proposed country. Indeed, because we review the district court's *forum non conveniens* determination for abuse of discretion, see *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981), and the relevant inquiry depends heavily on the particular facts of the case, our discussion is not meant to suggest anything about other such motions that may be brought in these cases.

## II

The Supreme Court recently revisited the topic of *forum non conveniens* in *Sinochem International Co. v. Malaysia International Shipping Corp.*, 127 S.Ct. 1184 (2000), which dealt with the question whether a district court may dismiss on grounds of *forum non conveniens* without first assuring that it has jurisdiction over the suit. In the course of deciding that it is permissible to take up the issue about the forum first, the Court reviewed the basic contours of *forum non conveniens*:

> A federal court has discretion to dismiss a case on the ground of *forum non conveniens* when an alternative forum has jurisdiction to hear [the] case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems. Dismissal for *forum non conveniens* reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality. We have characterized

6                                                             No. 06-1427

> *forum non conveniens* as, essentially, a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined.

*Sinochem*, 127 S.Ct. at 1190.

The Court continues to recognize *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), as the leading case recognizing and delineating the common-law doctrine of *forum non conveniens*. See *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996); *American Dredging Co. v. Miller*, 510 U.S. 443, 447-49 (1994). In *American Dredging*, the Court described the scope of the doctrine and repeated the passage from *Gulf Oil* that describes what ought to inform a district court's decision:

> An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility [sic] of a judgment if one is obtained . . . .

> Factors of public interest also have [a] place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the

No. 06-1427                                                            7

> country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

510 U.S. at 447-49 (quoting *Gulf Oil*, 330 U.S. at 508-09).

*Piper Aircraft* added two additional points that are important here. The first one was repeated in *Sinochem*: when the plaintiff has sued in his or her home forum, there is a strong presumption in favor of that choice. See *Piper Aircraft*, 454 U.S. at 255-56 (citing *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)). Under those circumstances, "A defendant invoking *forum non conveniens* . . . bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem*, 127 S.Ct. at 1191. Conversely, if the plaintiff is suing far from home, it is less reasonable to assume that the forum is a convenient one and therefore "the presumption in the plaintiff's favor 'applies with less force. . . .'" *Id.* (quoting *Piper Aircraft*, 454 U.S. at 266). Put the other way, the risk that the chosen forum really has little connection to the litigation is greater. We do not understand this as any kind of bias against foreign plaintiffs. That would be inconsistent with many treaties the United States has signed as well as with the general principle that our courts are open to all who seek legitimately to use them. It is instead a practical observation about convenience. A citizen of Texas who decided to sue in the federal court in Alaska might face an equally skeptical court, which might conclude that convenience requires a change in venue under the federal statutory counterpart to *forum non conveniens*, 28 U.S.C. § 1404(a).

The other important point *Piper Aircraft* made was that a dismissal based on *forum non conveniens* that is otherwise appropriate should not ordinarily be rejected just because it would lead to a change in applicable law unfavorable to the plaintiff. 454 U.S. at 247, 254. Only if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all" should the unfavorable change be given substantial—or even dispositive—weight. *Id.* at 254.

With these principles in mind, we are now ready to turn to the district court's decision to dismiss the claims of the U.K. plaintiffs here, based on its evaluation of the relative convenience of the United States and the United Kingdom as potential fora for this litigation. As we noted earlier, the standard of review is a deferential one: we may reverse only if we conclude that the district court abused its discretion.

### III

The plaintiffs' principal argument is that the court erred when it found that the United Kingdom is an adequate alternative forum for this case. The British courts fall short, they argue, because (as they put it) "the U.K. legal system strictly adheres to the 'but for' principles of causation and does not acknowledge market share or its variants that are available in the U.S." They acknowledge that a recent decision of the House of Lords, which sits as the highest court in the United Kingdom, has muddied the waters on that absolute proposition. See *Fairchild v. Glenhaven Funeral Servs., Ltd.*, (2003) 1 A.C. 32 (H.L.). In *Fairchild,* the Law Lords found that a plaintiff was entitled to recover in an asbestos case even though he could not identify which of his several employers may have exposed him to the asbestos fiber that caused his eventual mesothelioma. Plaintiffs here are pessimistic,

however, that the U.K. courts would extend the holding in *Fairchild* to their situation.

The district court devoted considerable attention to the question whether the U.K. courts are the kind of alternative forum the Supreme Court contemplates in its line of *forum non conveniens* cases. It heard expert testimony from experienced British lawyers, some of whom supported the plaintiffs (for example, Professor Adrian Briggs and Mark Mildred) and others (principally Nicholas Underhill) who supported the Drug Companies. Underhill, who has served as leading defense counsel in the two principal product liability cases brought in the United Kingdom in recent years—including a case brought by hemophiliacs against public health authorities—opined that the English courts would certainly entertain the cases and would be likely to rely on a straightforward negligence theory. He thought that it would be necessary for each plaintiff to allege and prove which defendant's concentrate was responsible for his infection. Mildred, in contrast, was a solicitor who coordinated the plaintiffs' case in the HIV litigation. Mildred acknowledged that it was possible that the British courts might apply the *Fairchild* exception to this case (and thus permit plaintiffs to recover without identifying a particular manufacturer), but he thought this was unlikely.

The district court looked carefully at *Fairchild*, in the light of this expert testimony. Lord Bingham of Cornhill, who delivered the lead speech, noted that in the case of mesothelioma caused by inhalation of asbestos fiber, "[M]edical science cannot support the suggestion that any of these possibilities [*i.e.*, that the fiber triggering the disease originated with manufacturer A or B] is to be regarded as more probable than any other. There is no way of identifying, even on a balance of probabilities, the source of the fibre or fibres which initiated the genetic process which culminated in the malignant tumour."

1 A.C. at 43. The other Law Lords came to similar conclusions, rejecting the conventional "but for" test of tortious liability in the special circumstances of the case before them.

The problem faced by the plaintiffs, in the district court's view, was identical. With the exception of one plaintiff who apparently used nothing but the concentrate of one fractionator, a hemophiliac infected with HIV or HCV has no way of knowing either when he was infected or by what particular infusion of concentrate. Over time, hemophiliacs are likely to use more than one brand of concentrate, depending on what their supplier has in stock. Further complicating matters is the fact that the virus may not be detectible in the blood of the infected person until many years after the infusion that caused the infection. The district court concluded that situation is indistinguishable from the facts of *Fairchild*, and that it was "very unlikely" that the courts of the United Kingdom would apply ordinary "but for" causation to the *Gullone* case. Instead, it predicted, they would apply the *Fairchild* exception to the causation element and proceed to adjudicate the claims.

This court held in *Kamel v. Hill-Rom Co.* that there are two parts to the "alternative forum" inquiry: availability and adequacy. 108 F.3d 799, 802 (7th Cir. 1997). *Kamel* explained that "[a]n alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction. An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." *Id.* at 803 (citation omitted). There is no question that the U.K. courts are available; the Drug Companies are amenable to process there and the district court conditioned its dismissal of the action on their agreement to accept service in actions in the U.K. courts (and to comply with several other obligations as well). The real question is whether the court's conclusion that the U.K.

courts offer an "adequate" alternative was within its discretion. We think that it was. *Piper Aircraft* establishes that the law in the United Kingdom need not be identical to U.S. law, or even as favorable to plaintiffs as U.S. law may be. The *Fairchild* decision demonstrates that the highest court of the United Kingdom has, at least in one setting, recognized the need to modify strict "but for" rules in this kind of case. We do not know, of course, whether the U.K. courts will apply *Fairchild* to the present case, but that kind of certainty is not required (especially in a common-law system like theirs). Lord Cornhill's speech in *Fairchild* recognized that the doctrine the Lords adopted there would grow over time, saying that "[i]t would be unrealistic to suppose that the principle here affirmed will not over time be the subject of incremental and analogical development. Cases seeking to develop the principle must be decided when and as they arise." *Fairchild*, 1 A.C. at 68. Finally, the fact that the *Fairchild* result has apparently been codified for purposes of asbestos cases, see Compensation Act 2006, 2006 c. 29 (U.K.), does not mean that the ordinary common-law process has been foreclosed for other types of cases.

As we noted earlier, *Gulf Oil* identified a number of private-interest factors that should be considered in connection with a motion to dismiss for *forum non conveniens*: (1) relative ease of access to sources of proof; (2) availability of compulsory process and costs for attendance of witnesses; (3) possibility of view of premises, if appropriate; and (4) other practical issues, including ease of enforcement of any ultimate judgment. See *Gulf Oil*, 330 U.S. at 508. Plaintiffs argue that there are "extreme impediments" to their funding of the litigation, if it were to proceed in the United Kingdom, largely because the English legal system uses a "loser pays" rule for attorneys fees and because compensatory damages tend to be low. We do not see how the use of a different

fee-shifting rule for attorneys' fees can weigh against dismissal, however, in light of *Piper Aircraft*. Obviously the English Rule is less favorable to plaintiffs whose chances of losing are too great (which, for risk-averse plaintiffs, might even be 30% or 40%), but we believe that must be regarded as the kind of unfavorable difference in legal system that carries little weight. In fact, the United States stands almost alone in its approach toward attorneys' fees, and so if we were to find that dismissal was wrong for this reason, we would risk gutting the doctrine of *forum non conveniens* entirely.

The district court was persuaded that the private-interest factors tended to show that the United Kingdom was the preferable forum. Although it thought that access to discovery was not a factor favoring dismissal, the other private interests—especially the ability of the defendants to join as third-party defendants various non-U.S. parties—supported its action. It found many of these factors to be in balance, including access to evidence and ease of discovery.

Turning to the public-interest factors, we begin with the district court's analysis of the administrative difficulties that could arise in either forum. The court assumed comparable congestion in the two legal systems, and then, without much explanation, concluded that "the administrative difficulties stemming from court congestion strongly favor the U.K. forum." In reaching that conclusion, it appeared to give substantial weight to the fact that there would be no jury trial in the United Kingdom, whereas there would be a Seventh Amendment right to a jury in the United States.

In our view, the fact that a plaintiff may exercise her constitutional right to a jury trial is not something that properly may weigh *against* keeping a case in the United States. To the extent that court congestion matters, what

No. 06-1427 13

is important is the speed with which a case can come to trial and be resolved. See *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984). In *Gates Learjet*, the court held, "[T]he real issue is not whether a dismissal will reduce a court's congestion but whether a trial may be speedier in another court because of its less crowded docket." *Id.* In addition, the court noted that "[t]he *forum non conveniens* doctrine should not be used as a solution to court congestion; other remedies, such as placing reasonable limitations on the amount of time each side may have to present evidence, are more appropriate." *Id.* Apart from administrative convenience, the *Gulf Oil* decision also notes that jury duty ought not to be imposed on the people of a community that has "no relation" to the litigation. As we discuss in a moment, however, California cannot be described that way. In our view, the burdens of jury duty are closely linked with the local interest in the litigation; they are not a separate reason to reject a case. Once we remove the jury question from the picture, the record is silent about the relative administrative advantages or disadvantages of California and the United Kingdom. We therefore regard this factor as neutral.

The district court thought that the United Kingdom's interest in the *Gullone* litigation substantially outweighed that of California. It noted that the U.K. government has shown considerable interest in the plight of hemophiliacs who became infected with HIV and HCV. There is also the obvious point that their medical care will be furnished at home and that the human impact of their illness will be felt first and foremost where they live. On the other hand, plaintiffs point out that California has an interest in the case because defendants Alpha, Bayer, and Cutter are headquartered there; defendant Bayer has its main manufacturing plant for Factor Concentrates there; and the plasma collection process took

14                                                              No. 06-1427

place there. These are not trivial local interests. They certainly do not make California a forum with "no relation" to the litigation. In the end, a rational person might come to either conclusion on this record: some might think that the greater interest lies in the place where the companies operated and allegedly committed the wrongs; others might find a greater interest in the place where the victims suffer from those wrongs and where the financial impact of the consequences will fall. Put another way, the record contains enough evidence to support the conclusion that the citizens of the United Kingdom have a greater interest in this controversy than those of the Northern District of California. In light of the fact that the plaintiffs have not sued in their home forum, and therefore that the presumption of convenience in their favor "applies with less force," *Sinochem*, 127 S.Ct. at 1191, we see no reversible error in the district court's conclusion that the defendants met their burden here.

## IV

The ruling on the Drug Companies' motion for dismissal on the basis of *forum non conveniens* easily could have gone either way. We therefore cannot say that the court abused its discretion when it concluded that the defendants' motion should be granted. The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—5-4-07